2003 OK CIV APP 64

**MONKEY ISLAND DEVELOPMENT AUTHORITY, Plaintiff/Appellee,**

v.

**Paul STATEN, Defendant/Appellant.**

**No. 97,519.**

Court of Civil Appeals of Oklahoma, Division No. 3.

July 2, 2003.

David Crutchfield, Monkey Island, OK, for Plaintiff/Appellee.

Carl Hughes, Kyle Goodwin, Hughes Artus & Goodwin, and James D. Kallstrom, Hartzog Conger Cason & Neville, Oklahoma City, OK, for Defendant/Appellant.

## OPINION

ADAMS, Presiding Judge.

¶1 Paul Staten appeals a judgment entered in favor of Monkey Island Development Authority (MIDA) following consolidation of its action for forcible entry and detainer with its action for fraud, conversion, and breach of various provisions of an FBO Agreement,[1] a Management Agreement, and a Store Agreement (collectively, the Contract). The trial judge found the Contract, under which Staten had for six years operated facilities at the Grand Lake Airport, invalid. The trial court further found that the MIDA board voting to accept the 1996 contract with Staten had lacked a sufficient quorum, had violated the Open Meeting Act, (as applicable to this matter, 25 O.S.Supp.1993 § 304, *et seq.*), and could not, because of those violations, subsequently ratify the contract or effectively amend it. The trial judge found there was no landlord-tenant relationship, and that issues of whether the contract had been breached by Staten were moot. Staten was ordered to be "evicted."

¶2 We conclude that the record does not support a finding of any violation of the Open Meeting Act or infirmity in the approval of the Contract. As a result of finding the Contract invalid, the judgment did not address defenses posed under the Contract or the effect of applicable law. As this matter was fully tried to the court, the matter is remanded for consideration, based upon the record, of the rights and duties of the parties

---

1. Here, FBO is an abbreviation for "fixed based operation," and refers to the buildings, hangars, ramps, fixtures, appurtenances and real estate at the airport.

under the Contract and any alleged breaches and the defenses available.

¶3 MIDA argued, in the alternative, that Staten either had breached the Contract or that he held its premises at the Grand Lake Airport illegally because the Contract was invalid. Staten contended that the Contract was valid, that terms of a document, entitled "Common Provisions," were incorporated by reference into the agreements forming the Contract, and that any alleged defaults or breaches were, under a proper reading of the text, either excused or did not constitute defaults or breaches.

## FACTS

¶4 MIDA was established with a Trust Indenture (Trust) filed with the Oklahoma Secretary of State on March 17, 1992. The beneficiary of the Trust was Delaware County, Oklahoma, and the original trustees named were Edwin M. DeCoursey, Jr., Eugene M. Gregg, and Don A. Davis, all of whom accepted their positions.

¶5 MIDA, by way of trustee Gregg and Robert H. Garwood as successor of trustee DeCoursey, and the trust beneficiary approved a "First Amendment to Trust Indenture" (First Amendment) in April of 1995. The First Amendment amended Article VI(1) of the Trust by increasing the number of trustees from the original 3 to 5. The First Amendment identified individuals for those 5 positions, namely Gregg, Davis, and DeCoursey plus James Orwig and John G. Wilcox, and was approved by Delaware County's Board of County Commissioners.

¶6 A Notice of Meeting and Agenda for a special meeting of MIDA on March 2, 1996, posted on February 28, 1996, lists as agenda items approval of minutes from an April 12, 1995 meeting and "[c]onsideration and discussion of contracts for fixed base operator of Shangri–La Airport, Airport management and lease of related property, including Store Agreement, FBO Agreement and Airport Management." Two trustees, Gregg and Garwood, voted to approve the Contract at the special meeting on March 2, 1996. An amendment to the store agreement portion of the Contract was entered into, according to its text, as of July 1, 1996.

¶7 A "Revised First Amendment to Trust Indenture" (Revision) in October of 1996, recites that MIDA "unsuccessfully undertook to add two additional trustees to their number" by way of the First Amendment, "which trustee positions were never filled." The Revision then asked the Delaware County Board of County Commissioners to revoke a resolution approving and accepting the First Amendment, which the Board did on October 7, 1996.

## ANALYSIS

### Quorum

¶8 Section 178 of Title 60 states:

C. Any instrument or will creating a trust which is not within the scope of subsection B [2] of this section shall provide for the appointment of a minimum of three trustees, their succession, powers, duties, term, manner of removal and compensation subject to the provisions of subsection E of this section, and in all such respects the terms of said instrument or will shall be controlling. If the instrument or will makes no provision in regard to any of the foregoing, then the general laws of the state shall control as to the omissions.

MIDA argues, as it did in the trial court, that a quorum is a majority of the members of a public body. While this is generally true, we need not resort to general statements or outside sources for a definition of a quorum because this term is specifically defined in the Trust. Article VI(2) of the Trust provides, in relevant part, that "[a] quorum shall consist of two (2) or more Trustees qualified to act."

¶9 Although MIDA at first denied that one of its trustees was, in fact, a trustee at the time the Contract was signed, the record shows that trustee's status was ultimately established. The record clearly shows that notice was posted for the special meeting on

---

**2.** Section B, which is not at issue here, concerns trusts naming the State of Oklahoma as the bene-ficiary.

March 2, 1996, and that two trustees were present at the special meeting and had voted to approve the Contract. Therefore, according to the express terms of the Trust, a quorum was present. The trial court's finding that a quorum was lacking on the day the Contract was approved is therefore not supported in the record and is in error.

### Qualification of Trustees

■ ¶ 10 Our inquiry into the validity of the Contract does not end with the determination regarding the quantum necessary for a quorum. Article VI(2) of the Trust also provides: "All actions by the Trustees pursuant to the provisions of this Trust Indenture shall be approved by the affirmative vote of at least a majority of the Trustees *qualified to act* as such under the provisions of this Trust Indenture." (Emphasis added.) While two may be a quorum under the express provisions of the Trust, the number required for a majority must be separately considered. Therefore, although a quorum may have been present and have voted to accept the Contract, the essential questions presented to us, as they were to the trial court, are who were the trustees "qualified to act" and what quantum of trustee participation was required for valid approval under the Trust's provisions?

¶ 11 At trial, the center of this controversy was the effect of the First Amendment and the subsequent Revision to the Trust. As he does here, Staten argued that "Trustees qualified to act" must be construed with reference to 60 O.S.2001 § 178(A), which states, in pertinent part:

> Every person hereafter becoming a trustee of a public trust *first shall take* the oath of office required of an elected public officer ... The oaths of office shall be administered by any person authorized to administer oaths in the State of Oklahoma, and shall be filed ... in the office of the county

clerk in a trust wherein any county is beneficiary. (Emphasis added.)

Oklahoma law clearly required that the trustees of this public trust subscribe to their oath of office in order to be qualified to act. As Oklahoma Constitution Art. 15, § 1 instructs, all public officers must take and subscribe to the oath there given "before entering upon the duties of their offices," and this requirement also clearly is stated in 51 O.S.2001 § 2, which states, in pertinent part, that "[e]very state, county, township, city, town, school district, or other officer under the laws of the state, and every deputy or assistant of any such officer," shall take the oath "before entering upon the duties of his office."

¶ 12 There was no evidence presented that two of the persons named in the First Amendment had ever acted as trustees,[3] or took the oath required to serve as trustees. Therefore they were not "qualified to act" as trustees of MIDA, and the number of trustees "qualified to act" was never more than three. Consequently, the affirmative vote of two qualified trustees was sufficient to approve the Contract, and the trial court's conclusion that the Contract was never approved by the trustees was error.[4]

### Open Meeting Act

■ ¶ 13 MIDA cites 25 O.S.1991 § 304(2) as supporting its contention that the signing of the FBO, Management and Store agreements on March 1, 1996, by only one MIDA trustee and the approval of the Contract at the March 2, 1996 Special Meeting by two trustees were in violation of the Open Meeting Act. Section 304(2) states that " 'Meeting' means the conduct of business of a public body *by a majority of its members* being personally together or, as authorized by Section 307.1 of this title, together pursuant to a teleconference." (Emphasis added.) Applying this definition, it is not a violation of the Open Meeting Act for *less* than a majority of a public body to meet. Therefore, even un-

---

3. Because, according to this record, neither person named acted or attempted to act as a trustee under color of authority, no issue of "officer defacto" was presented. *See, e.g., Ajax Contractors, Inc. v. Myatt,* 1967 OK 19, 424 P.2d 30.

4. The trial court's correct conclusion that the signing of the agreements by only one of the trustees was a not valid approval is of no consequence. Staten did not contend that action had any effect, and the Contract was approved properly at the meeting the next day.

der MIDA's theory of the membership, there is no violation of the Open Meeting Act on March 1, 1996, or on March 2, 1996, because there was no majority present on either date. Without a majority, there could be no "meeting" under the Act and no violation.

¶ 14 We have concluded that majority of the members were present on March 2, 1996, and accordingly, those proceedings *were* required to comply with the provisions of the Open Meeting Act. However, the record is clear that the meeting was properly called and the appropriate notices were posted in a timely manner. The Open Meeting Act was not violated by the March 2, 1996 meeting.

### The Contract

¶ 15 Finally, we note that the trial court found that the Contract "consisted of the Store Agreement, FBO Agreement and Management Agreement." At trial, Staten argued that the Contract also included a document "Common Provisions." There is no dispute that the FBO Agreement, Store Agreement and Management Agreement all state "The 'Common Provisions,' dated as of March 1, 1996, attached hereto are incorporated herein by reference."

¶ 16 At trial, MIDA's representative admitted he found a document entitled "**COMMON PROVISIONS** Dated as of March 1, 1996" (emphasis in original) in its files but it was not physically attached to any of the three underlying agreements. MIDA argued that the "Common Provisions" document admitted as Defendant's Exhibit 1 was not a part of the Contract, citing that it was not separately signed. MIDA did not propose that another "Common Provisions" document than the one admitted into evidence at trial was the one referenced in the agreement, only that it did not have separate signatures. MIDA cites no authority supporting the proposition that a lack of separate signature on such a contract attachment, which has been identified and explicitly incorporated, somehow nullifies and makes ineffectual the contractual attachment.

¶ 17 Staten identified the exhibit as being the "Common Provisions" referred to and incorporated into the Contract, and its pages are consecutively numbered to match the pages of the agreements which were signed. The trial court's findings are susceptible of the interpretation that it found the "Common Provisions" were not a part of the "Contract." Such a finding has no support in the evidence and must be reversed. Upon remand, the interpretation of the Contract must include the text contained in the "Common Provisions" because those provisions are incorporated by reference into the three underlying agreements.

### CONCLUSION

¶ 18 Because it found the Contract to be invalid, the trial court did not address the other issues raised by the parties, and it would be inappropriate for us to do so before the trial court has made its decision on those questions. The trial court's judgment is reversed, and the case is remanded for a trial court decision addressing those additional issues upon the evidence presented at trial.

REVERSED AND REMANDED.

JOPLIN, C.J., and BUETTNER, J., concur.