**FILED**

United States Court of Appeals
Tenth Circuit

**March 26, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

J.D. KIRK, LLC; DAVID KIRK,

      Plaintiffs Counter Defendants -
Appellants,

v.

CIMAREX ENERGY CO.,

      Defendant Counterclaimant -
Appellee.

No. 14-6122
(D.C. No. 5:11-CV-00384-W)
(W.D. Oklahoma)

ORDER AND JUDGMENT[*]

Before **BACHARACH**, **BALDOCK** and **McHUGH**, Circuit Judges.

      This case involves a dispute over rights in certain oil and gas property located in

Canadian County, Oklahoma. Plaintiffs David Kirk and J.D. Kirk, LLC (collectively

Kirk) appeal the decisions of the United States District Court for the Western District of

Oklahoma, denying Kirk's quiet title claim against defendant Cimarex Energy Company

(Cimarex), and Kirk's alternative claim seeking specific performance of a preferential

---

      * This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and 10th
Circuit Rule 32.1.

right to purchase in a Joint Operating Agreement. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

### A.  *Factual Background*

The parties dispute the ownership of certain oil and gas leases and the contractual rights to operate in a 640-acre section of land in Canadian County, Oklahoma, identified as Section 24. Located within Section 24 are two wells significant to this appeal. The first is the Kitson No. 1 well, which drills into the Morrow Formation located above 11,000 feet below ground. A second well, the Rother 1-24H well, is also located in Section 24 and drills into the Woodford Shale Formation, which is located below 11,000 feet. The Oklahoma Corporation Commission has established spacing orders that govern the extraction and division between leaseholders of oil and gas contained in each formation in Section 24. Both Kirk and Cimarex claim an interest in the oil and gas extracted from the Woodford Shale Formation.

Specifically, Kirk claims an interest in deep formation rights in various leases located in Section 24. The parties direct our attention to five leases relevant on appeal: Lease No. 1—Lessor Henry Rauh, et ux.; Lease No. 3—Lessor Henry H. Girard, et ux.; Lease No. 4—Lessor The Prospect Company; Lease No. 13—Lessor Myers Jr., M.T. et

al, trustees; and Lease No. 24—Lessor William H. Meyer et ux.[1] But Kirk seeks to quiet title to deep formation interests in only three of them: Lease Nos. 4, 13, and 24 (collectively, the Leases).[2]

Kirk also asserts it is entitled to "contract rights" to operate in 53.3333 unleased acres located in Section 24. According to Kirk, this entitlement arises under a 1968 Joint Operating Agreement (the Joint Operating Agreement), which gives parties to the agreement a relative percentage of "[a]ll production of oil and gas from the Unit Area." Under the terms of the Joint Operating Agreement, the Unit Area includes Lease Nos. 4, 13, and 24, as well as an "[u]nleased oil and gas mineral interest contributed by Cities

---

[1] The parties have identified various relevant leases by lease number and lessor. Because the leases in the relevant documents are not numbered, we have identified them by reference to the lessor.

[2] Before the district court and on appeal, the parties seemed confused about the leases in which Kirk seeks to quiet title. This imprecision required us to invest significant time combing through the record to identify and trace the leases at issue. For example, in Kirk's Third Amended Complaint, it at times seeks an interest in Leases 3, 4, and 13, which Kirk identified as the "Subject Leases." But at other times in the Third Amended Complaint, Kirk seeks to quiet title in Lease Nos. 1, 3, 4, 13, and 24. Before the district court, Cimarex conceded it owned no interest in Lease No. 3, and at oral argument before this court, the parties agreed that Kirk seeks to quiet title in Lease Nos. 1, 4, and 13. As explained in detail below, however, the relevant documents show Cimarex does not have an interest in Lease No. 1; it holds record title to Lease Nos. 4, 13, and 24. Accordingly, we assume for the purposes of this appeal that Kirk seeks quiet title against Cimarex in the deep formation interests covered in these three leases: 4, 13, and 24.

-3-

Service Oil Company: An undivided 1/3 interest in the minerals underlying the NE/4 of Section 24-13N-10W."[3]

The Joint Operating Agreement also contains a preferential right to purchase provision, which requires any party to give written notice to the other parties to the Joint Operating Agreement of the proposed sale of any interest in the Unit Area, the prospective purchaser, the purchase price, and all other terms of the offer. The other parties then have fifteen days after receipt of the notice to purchase the interest at the same terms and conditions. Kirk became a party to the Joint Operating Agreement in 1991. At this time, the other parties to the Joint Operating Agreement were OXY USA, Inc., William Schofield, Conoco Inc., Amoco Production Company (Amoco), and John W. Coffey Est. Trust.

1. **The Dispute Over the Deep Formation Interests in Lease Nos. 4, 13, and 24 and the Contract Rights to Operate in the 53.3333 Unleased Acres**

The genesis of the parties' present dispute concerning ownership of the deep formation rights in the Leases and the contract rights in 53.3333 unleased acres is a 1996 agreement under which the original owner of these interests, Amoco, transferred to Kirk "all right, title and interest in and to" the Leases and contract rights. Kirk did not record the assignment until approximately five years later, in 2001.

---

[3] It is undisputed that the provision referencing the "1/3 undivided interests" describes the same 53.3333 unleased acres in which Kirk claims contractual operating rights.

In 1997, prior to Kirk's 2001 recordation, Amoco sold a large number of oil and gas leases to Gothic Energy Co. (Gothic), including its interest in the same Leases and contract rights previously transferred to Kirk. Specifically, Amoco and Gothic entered into a Purchase and Sale Agreement (the PSA), under which Amoco sold to Gothic certain "Properties" located in Section 24. The PSA defines "Properties" as including

> [a]ll of [Amoco's] right, title and interests in, to and under, or derived from, the oil and gas leasehold interests, royalty interests, overriding royalty interests, mineral interests, production payments, net profits interests and surface interests . . . described in Exhibit "A."

The PSA's Exhibit A does not identify any particular leases, but instead contains a list of "Working Interests, Net Revenue Interests and Defect Value." It divides these interests into "Producing Properties" and "Nonproducing Properties." Listed as a "Producing Property" in Exhibit A of the PSA is a property identified as the "Kitson Unit." In addition, the PSA transferred to Gothic "[a]ll of [Amoco's] right, title and interests in, to and under, or derived from, all of the presently existing and valid . . . operating agreements . . . and other contracts . . . (including but not limited to the material contracts described in Exhibit 'C')." Exhibit C expressly lists as a "material contract" the Joint Operating Agreement. The PSA also contains an integration clause.

One year later, Amoco and Gothic entered into an Assignment and Bill of Sale (the Assignment), which they made retroactively effective as of 1997. Through this Assignment, Amoco conveyed to Gothic

> [a]ll of [Amoco's] right, title, and interests in, to and under, or derived from, the oil and gas leasehold interests, royalty interests, overriding

-5-

> royalty interests, mineral interests, production payments, net profits
> interests and surface interests . . . described in Exhibit "A."

The Assignment's Exhibit A expressly lists the Leases. The Assignment also incorporates by reference the terms of the PSA and provides that in the event of a conflict between the documents, the terms of the PSA control. Gothic recorded the Assignment in 1998, three years before Kirk recorded the assignment to him from Amoco.

After Gothic executed the Assignment, Chesapeake Exploration, LLC (Chesapeake) acquired Gothic by merger and thereby obtained all of the rights and interests in the Leases and Joint Operating Agreement that Amoco had assigned to Gothic in the PSA and Assignment. In 2008, Chesapeake entered into a Purchase and Sale Agreement with Cimarex and assigned it "[a]ll of [Chesapeake's] right, title, and interest in and to" the Leases "insofar and only insofar as to" Chesapeake's deep formation rights. Chesapeake also conveyed to Cimarex its contractual operating rights under the Joint Operating Agreement to develop the 53.3333 unleased acres. Cimarex recorded its assigned interests in October 2008.[4]

## 2. The Drilling and Completion of the Rother 1-24H Well

Beginning in February 2008, Devon Energy Company (Devon) began soliciting interested lessors of Section 24 to participate in the drilling and completion of the Rother 1-24H well. Devon, which was not an original party to the Joint Operating Agreement,

---

[4] In 2012, Cimarex recorded a corrected assignment, which clarified that in the 2008 conveyance, Chesapeake intended to transfer to Cimarex the Leases as well as the contractual operating rights to develop the 53.3333 unleased acres in Section 24.

contacted Kirk to advise that it proposed to drill a 16,000-foot well into the Woodford Shale in Section 24. Devon predicted the "dry hole cost" would be $4,997,500.00 and the total cost to drill and complete the well would be $7,035,800.00. Devon invited Kirk to select one of three options: Kirk could participate by paying a proportionate share of costs; lease its interest for $600 per acre for a three-year term, reserving a 3/16 royalty interest; or lease its interest for $200 per acre, reserving a 1/4 royalty interest. Later that same month, Kirk received notice that Devon had filed a pooling application for the Woodford Shale Formation and other adjacent formations in Section 24 with the Commission and that the Commission had scheduled a hearing on the application.

In March of 2008, Kirk also received a copy of a Commission order granting Devon's pooling application and designating Devon as the well operator. The order advised Kirk that it could elect one of the three options Devon had initially proposed. Attached to the order was a list of all interest owners in Section 24, which listed both Chesapeake and Chesapeake/Gothic. Kirk advised Devon it would not participate in the drilling and completion of the Rother 1-24H well, but would instead lease its interest for $200 and receive a 1/4 royalty interest.

In October 2008, Cimarex acquired some of Chesapeake's rights in Section 24 and elected to participate in the drilling and completion of the Rother 1-24H well. Construction on the well began in March 2009 and was completed in June of the same year. As predicted, the well was drilled into the Woodford Shale Formation, with perforations from 12,968 to 17,222 feet below the surface, costing over $7.4 million to

complete. Of that sum, Cimarex paid approximately $1.4 million. Since its completion, the well has produced approximately 4,269,674 cubic feet of natural gas and approximately 54,237 barrels of condensate.

In November 2009, Devon sent Kirk a letter advising him that a title attorney had discovered Kirk and Cimarex had recorded competing interests in Section 24. Devon advised Kirk that "[u]ntil record title can be clarified, your interest will remain in suspen[ded] status. Please review this requirement and forward the needed documentation at your earliest convenience." Also enclosed with the letter was a proposed division order from the Commission, which listed Cimarex as a working interest owner in Section 24.

In an effort to remove any questions about title to the Leases and contract rights, in October 2010, an attorney for Cimarex sent Kirk a letter that proposed a Stipulation and Cross-Conveyance. By the Stipulation and Cross-Conveyance's terms, Kirk would retain a 100% interest in Lease Nos. 1 and 3, and a 40.45% interest in the Leases (Lease Nos. 4, 13, and 24). In turn, Chesapeake would retain a 59.55% interest in the Leases, as well as a 100% interest in the contractual operating rights to the 53.333 unleased acres. Rather than sign the Stipulation and Cross-Conveyance, Kirk filed this lawsuit.

### B. *Procedural Background*

In 2011, Kirk filed a Petition in Oklahoma state court alleging Cimarex breached the Joint Operating Agreement's preferential purchase provision (Count I) and tortiously interfered with Kirk's preferential purchase rights (Count IV). It sought an accounting

and specific performance of the Joint Operating Agreement (Counts II and III, respectively). Cimarex removed the case to the United States District Court for the Western District of Oklahoma under 28 U.S.C. § 1332 and successfully moved to dismiss Counts I and IV of the Petition. The district court held that Cimarex—as merely the buyer from Chesapeake—was not a party that could have breached the preferential right to purchase provision contained in the Joint Operating Agreement and that Kirk's tort claim was time barred.

Kirk then filed a First Amended Complaint in the district court, alleging that Cimarex was trespassing in bad faith through participating in the Rother 1-24H well's deep formation drilling activities. Kirk alleged that the Amoco-Gothic conveyance failed to transfer any interest in Section 24 to Gothic and therefore Cimarex could not have obtained these interests from Chesapeake. Kirk also realleged that it was entitled to specific performance of the Joint Operating Agreement's preferential right to purchase. The district court dismissed the trespass claim but allowed Kirk's claim for specific performance to proceed in equity.

Kirk then filed a Second Amended Complaint, seeking quiet title and reasserting that Cimarex had trespassed on its deep formation interests. According to Kirk, it owned the deep formation rights in the Leases through the assignment from Amoco in 1996. In support, Kirk alleged that the Amoco-Gothic conveyance transferred only a shallow drilling interest in the Leases and therefore Gothic could not have transferred any deep formation rights to Chesapeake. Kirk further claimed that Chesapeake's attempt to assign

-9-

deep formation interests in the Leases to Cimarex was invalid because Chesapeake did not own any such interests to assign.

Cimarex moved to dismiss, and Kirk sought partial summary judgment. The district court converted Cimarex's motion to one seeking summary judgment, which, after supplemental briefing, the court granted. It determined that the PSA and Assignment between Amoco and Gothic unambiguously transferred all of Amoco's interest in the Leases, including deep formation rights, to Gothic. In so holding, the court declined to consider extrinsic evidence in the form of the Commission's spacing order regarding the Kitson No.1 well and a previous agreement between Amoco and Essex Exploration, Inc. (Essex) related to certain shallow formation interests in Section 24. The court granted summary judgment in favor of Cimarex on Kirk's quiet title claim but allowed Kirk's equitable claim for specific performance of the preferential right to purchase to proceed.

Thereafter, Kirk filed a Third Amended Complaint against Cimarex, reasserting its claim for quiet title and trespass. But this time it proceeded under a different legal theory. It alleged that even if in 1997 Amoco did convey deep formation interests to Gothic, Gothic's 2008 conveyance to Cimarex did not include such rights because Kirk recorded its interest first, in 2001. Kirk also asserted that the Amoco-Gothic conveyance did not convey any contractual rights in the 53.3333 unleased acres to Gothic.

Cimarex again moved to dismiss Kirk's quiet title claim. Cimarex first noted the absence of any evidence that Gothic had knowledge of Kirk's unrecorded interest in the deep formation rights. It then argued that as a bona fide purchaser for value (BFP) that

recorded its interest first, Gothic took the deep formation interests free of Kirk's competing interest. And that under the shelter rule,[5] Cimarex enjoyed the same BFP status as Gothic, irrespective of whether it had constructive notice of Kirk's 2001 recordation. Cimarex also claimed the Amoco-Gothic conveyance plainly and unambiguously transferred to Gothic the contractual rights to operate in the 53.3333 unleased acres. The district court agreed with Cimarex and dismissed Kirk's quiet title claim in the Third Amended Complaint.

Finally, Cimarex moved for summary judgment on Kirk's equitable claim for specific performance of the Joint Operating Agreement's preferential right to purchase. The court granted Cimarex's motion under the doctrine of laches, holding that Kirk had waited too long to bring its claims, while Devon and Cimarex incurred the costs of developing the Rother 1-24H well. Having disposed of each claim in the Third Amended Complaint, the district court entered judgment in favor of Cimarex. Kirk appeals.

---

[5] The shelter rule provides that one who is not a BFP, but who takes interest in the property from a BFP, may take shelter in the latter's protected status. *See, e.g.*, *Knowles v. Freeman*, 649 P.2d 532, 535 (Okla. 1982) ("Title to the mineral interest having passed to a bona fide purchaser prior to the recording of the 'corrective' deed, it becomes of no consequence whether defendant had notice of the claim of plaintiffs that the conveyance included the mineral interest in the 40-acre tract at the time defendant acquired title."); *Gay v. Williams*, 226 P. 88, 91 (Okla. 1924) ("the plaintiffs . . . , having taken title to the mortgage from [a] bona fide purchaser, are entitled to the protection afforded a bona fide purchaser, whether such plaintiffs in error made inquiry in regard to the title or used diligence in examining the same or not.").

## II.    DISCUSSION

On appeal, Kirk claims the district court erred in two respects: by dismissing its quiet title claim and by holding that its specific performance claim is barred by laches. We consider, and reject, both claims.

### A.  *Kirk does not hold title to deep formation interests in the Leases or the contractual rights in the 53.3333 unleased acres.*

Kirk first claims the district court erred in rejecting its quiet title claim. Kirk argues, as it did in the district court, that Amoco assigned the deep formation interests in the Leases and the contractual rights in the 53.3333 acres to Kirk in 1996 and did not subsequently assign these same interests to Gothic. According to Kirk, the district court erred in interpreting the Amoco-Gothic PSA and Assignment, which, when properly read, limit the conveyance to shallow interests in the Leases and do not convey any contractual rights to operate in the 53.3333 acres.[6] We review the district court's interpretation of the PSA and Assignment de novo. *Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012).

---

[6] As previously explained, the district court dismissed Kirk's quiet title claim in its Third Amended Complaint through application of the shelter rule, concluding that because Gothic was a BFP of the deep formation interests, Cimarex could take shelter in Gothic's status and take those interests free of any competing claim. On appeal, Kirk does not challenge the district court's application of the shelter rule, asserting instead that Gothic could not have been a BFP of the deep formation interests in the Leases because Amoco never transferred those interests to Gothic. We limit our inquiry on appeal accordingly. *See Constitution Party of Kan. v. Kobach*, 695 F.3d 1140, 1144 (10th Cir. 2012) (where "a party chooses not to assert . . . a certain argument on appeal, we generally will not consider that argument in our review").

The PSA provides that it "shall be governed by and construed under the Laws of the State of Oklahoma." In interpreting the terms of the PSA and Assignment, therefore, we are bound by the Oklahoma Supreme Court's most recent statement of applicable law, and we follow any state intermediate court decisions absent "convincing evidence that the highest court would decide otherwise." *Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1204 (10th Cir. 2011) (internal quotation marks omitted).

In Oklahoma, "[t]he primary goal of contract interpretation is to determine and give effect to the intention of the parties at the time the contract was made." *May v. Mid-Century Ins. Co.*, 151 P.3d 132, 140 (Okla. 2006). In arriving at the parties' intent, we give the terms of an instrument their plain and ordinary meaning. *Id.* And we consider a contract "as a whole so as to give effect to all its provisions without narrowly concentrating upon some clause or language taken out of context." *Mercury Inv. Co. v. F.W. Woolworth Co.*, 706 P.2d 523, 529 (Okla. 1985). This requires us to reconcile and harmonize apparently conflicting provisions so as to give meaning to both, rather than rendering a provision meaningless. 17A C.J.S. *Contracts* § 412. Likewise, we must read together "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction," Okla. Stat. tit. 15, § 158, and consider as part of the contract all terms expressly incorporated by reference, *see Monkey Island Dev. Auth. v. Staten*, 76 P.3d 84, 88 (Okla. Civ. App. 2003). If, after engaging in this inquiry,

the language of a contract is clear and unambiguous on its face, we must give effect to its terms as expressed within its four corners. *Mercury Inv. Co.*, 706 P.2d at 529.

Guided by these principles of contract interpretation, we agree with the district court that Amoco unambiguously transferred its contractual rights in the 53.3333 unleased acres as well as its deep formation rights in the Leases to Gothic. As an initial matter, we can easily dispose of Kirk's claim that it is entitled to contractual operating rights in the 53.3333 unleased acres located in Section 24 because Amoco conveyed these rights to Gothic in the PSA. By its plain terms, the PSA conveys to Gothic "[a]ll of [Amoco's] . . . right, title and interests in, to and under, or derived from, all of the presently existing and valid . . . operating agreements," and specifically identifies the Joint Operating Agreement. Therefore, when Chesapeake acquired Gothic, it obtained Gothic's contract rights in the 53.3333 unleased acres and was free to assign them to Cimarex.

Likewise, we are confident the Amoco-Gothic conveyance unambiguously transferred Amoco's deep formation rights in the Leases to Gothic. By its plain terms, the Assignment to Gothic conveys

> [a]ll of [Amoco's] right, title and interests in, to and under, or derived from, the oil and gas leasehold interests, royalty interests, overriding royalty interests, mineral interests, production payments, net profits interests and surface interests which are described in Exhibit "A."

In turn, the Assignment's Exhibit A describes each of the Leases. There is nothing in the Assignment or on its Exhibit A that limits the conveyance to a particular depth.

-14-

Nevertheless, Kirk argues the Assignment's seemingly broad grant of "all of [Amoco's] right title and interest in" the Leases is modified or limited by the reference of Exhibit A of the PSA to a "Producing Property" identified as the "Kitson Unit." According to Kirk, this reference implies either that Amoco intended to convey only shallow interests in the Leases because the Kitson No. 1 well is spaced to drill only into the Morrow Formation or that the documents are ambiguous in this respect. We disagree.

Even if the PSA could be reasonably interpreted to convey a limited assignment of specific net revenue and working interests in a producing property identified as the "Kitson Unit," this does not mean that Amoco intended to include any particular depth limitation when it broadly assigned the Leases to Gothic in the subsequent Assignment. Nor can the documents, when read together, be reasonably interpreted to do so. The portion of the PSA's Exhibit A relied on by Kirk is limited to "Working Interests, Net Revenue Interests and Defect Value" in various "Producing" and "Nonproducing" properties. It does not reference the Leases or purport to list the underlying leases that give rise to these working interests, net revenue interests, or defect values, which Amoco then unambiguously transferred to Gothic by the Assignment.

Moreover, there is nothing that would render the Agreement's more limited conveyance of interest in the producing property identified as the Kitson Unit inconsistent with the Assignment's broader transfer of "all of [Amoco's] right title and interest to" the Leases. The PSA nowhere indicates Amoco intended to limit the conveyance to *only* working interests, net revenue interests, and defect value in the

-15-

producing properties identified in the PSA. Nor does the Assignment purport to reflect any such limitation. To the contrary, careful examination of the Assignment belies such an assertion.

Where Amoco intended to convey a less than complete interest in a particular lease, it specifically noted the limitation on Exhibit A to the Assignment. For example, with respect to one lease identified by reference to Lessor Shelby et al Vilette L., the exhibit notes that the lease transferred is "less and except the wellbore of the Meiwes A-2 well located 950 feet east of the center of the SW/4 of said Section 27, but only as to the Morrow Formation, and less and except the Morrow Formation." Exhibit A to the Assignment contains no similar depth limitation for any of the Leases at issue in the instant case.

Reading the Assignment and PSA together, we affirm the district court's conclusion that they unambiguously transferred to Gothic Amoco's working interests, net revenue interests, and defect value in the producing property identified as the Kitson Unit, as well as all of its "right, title and interest" in the Leases, which necessarily includes deep formation rights. As required by Oklahoma law, this interpretation considers all parts of the contract and avoids creating unnecessary conflict between the more limited conveyance described in the PSA and the broader conveyance described in the Assignment.

Because the district court was correct that Amoco unambiguously assigned to Gothic its deep formation rights in the Leases, it also was correct in refusing to consider extrinsic evidence in interpreting the PSA and Assignment.

In sum, we conclude Gothic acquired Amoco's contractual operating interests in the 53.3333 unleased acres and its deep formation rights in the Leases under the unambiguous terms of the Agreement and Assignment. Chesapeake subsequently acquired these interests through merger and then transferred them intact to Cimarex. The district court therefore correctly rejected Kirk's quiet title claim.

## B. *Cimarex is entitled to summary judgment on Kirk's equitable claim for specific performance.*

Second, Kirk challenges the district court's application of the doctrine of laches to bar Kirk's claim for specific performance of the Joint Operating Agreement's preferential right to purchase provision. Cimarex asks us to affirm the district court's decision on the basis of laches and alternatively asks us to affirm on five additional grounds raised before, but not ruled on by, the district court. We begin by discussing the district court's laches ruling. Because we conclude the district court correctly determined Cimarex is entitled to summary judgment on the basis of laches, we do not address the alternate grounds advanced by Cimarex.

Generally, we review a district court's laches decision for an abuse of discretion. *See Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036, 1090 (10th Cir. 2014); *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1337 (10th Cir. 1982) ("As with other

-17-

equitable defenses, the existence of laches is a question primarily addressed to the discretion of the trial court." (internal quotation marks omitted)). But where, as here, the district court grants a defendant summary judgment on the basis of laches, our review is de novo. *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 948 (10th Cir. 2002). In determining whether Cimarex is entitled to summary judgment, we view all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party, Kirk. *See Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997). Like Kirk's quiet title claim, the parties agree Oklahoma law governs our laches inquiry. As the party invoking laches, Cimarex bears the burden of establishing (1) Kirk unreasonably delayed in bringing an action against Cimarex for specific performance of the preferential right to purchase provision and (2) Cimarex was materially prejudiced by that delay. *See Hedges v. Hedges*, 66 P.3d 364, 369 (Okla. 2002). Before we undertake the analysis of whether the district court correctly concluded Cimarex met that burden, we pause to dispel Kirk's notion that Cimarex must also prove it has suffered irreparable harm.

Although Kirk is correct that the Oklahoma Supreme Court has stated, "The party invoking the defense of laches must prove that it suffered some irreparable damage or loss because of a change of conditions in relying on the inaction and indifference of the other party," *Clark v. Unknown Heirs of Osborn*, 782 P.2d 1384, 1386 (Okla. 1989), we do not read *Clark* as establishing irreparable harm as a required element. Rather, *Clark* indicates a party may establish prejudice through showing "irreparable damage *or* loss." *See id.* (emphasis added). Interpreting *Clark* in this way is consistent with the weight of

-18-

authority from the Oklahoma courts, this circuit, and other states, none of which have required a plaintiff to establish irreparable harm. *See, e.g.*, *Nichols v. Nichols*, 222 P.3d 1049, 1056 n.24 (Okla. 2009) ("Before a claim will be considered barred by laches it must be shown that (a) there has been an unreasonable delay in the commencement of proceedings to enforce the claim and that (b) by reason of this delay the defendant has been materially prejudiced"); *Smith v. Baptist Found. of Okla.*, 50 P.3d 1132, 1138 (Okla. 2002) (citing *Clark* for the position that "[t]he party invoking the laches defense must show unreasonable delay coupled with knowledge of the relevant facts resulting in prejudice"); *Hedges*, 66 P.3d at 369 ("Before a claim will be considered barred by laches it must be shown that (a) there has been an unreasonable delay in the commencement of proceedings to enforce the claim and that (b) by reason of this delay the defendant has been materially prejudiced."); *Chesapeake Operating, Inc. v. Carl E. Gungoll Exploration, Inc.*, 116 P.3d 213, 216 (Okla. Civ. App. 2005) (holding that defendant had established prejudice where it was induced to invest great sums of money due to the plaintiff's inaction); *Jiron*, 762 F.3d at 1091 (stating that "[l]aches bars a claim when there is: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense" and noting that prejudice may be established where defendant has expended time and effort (internal quotation marks omitted)); *Veysey v. Veysey*, 339 P.3d 131, 135 (Utah App. 2014) ("To successfully assert a laches defense, a defendant must establish both that the plaintiff unreasonably delayed in bringing an action and that the defendant was prejudiced by that delay."). And in any

-19-

event, when exercising our diversity jurisdiction, we are required to follow the Oklahoma Supreme Court's *most recent* statement of applicable law, which has plainly required prejudice rather than irreparable harm. *See Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1204 (10th Cir. 2011); *Nichols*, 222 P.3d at 1056 n.24 (requiring prejudice rather than irreparable harm as an element of laches). Accordingly, we decline Kirk's invitation to adopt irreparable harm as a required element of laches in Oklahoma.

We now consider whether the district court correctly concluded that Cimarex is entitled to a laches defense as a matter of law. "Laches is an equitable defense to stale claims." *Smith*, 50 P.3d at 1138. "There is no arbitrary rule for when a claim becomes stale or what delay is excusable." *Id.* Rather, "[t]he doctrine . . . is a purely equitable one, and arises only whenever, from the lapse of time and laches of the plaintiff, it would be inequitable to allow a party to enforce his legal rights." *Phelan v. Roberts*, 77 P.2d 9, 12 (Okla. 1938). In Oklahoma, the doctrine of laches "will be rigorously applied in suits involving property of speculative value, such as mining and particularly oil properties." *Holshouser v. Lee*, 369 P.2d 616, 621 (Okla. 1961). As the Oklahoma Court of Civil Appeals explained,

> the duty to act with dispatch is especially imperative where one claims an interest in property that is highly speculative. One may not withhold his claim to a highly speculative venture, such as was involved in these wildcat oil and gas leases and permits, to await the outcome of an effort to develop them put forth by another, and then when his efforts are crowned with apparent success, come in and claim the fruits thereof. . . . [L]aches does

not concern itself with the mere lapse of time, but with the inequity of permitting a claim to be enforced.

*Chesapeake Operating*, 116 P.3d at 216 (quoting *Winn v. Shugart*, 112 F.2d 617, 622 (10th Cir. 1940) (internal quotation marks omitted)); *accord Parker v. Ryan*, 287 P. 1006, 1008 (Okla. 1930) (explaining that a plaintiff cannot "wait several months, and, after a well had been discovered that greatly enhanced the value of the land, then be permitted to have his contract specifically enforced"); *see also Socony Mobil Oil Co. v. Cont'l Oil Co.*, 335 F.2d 438 (10th Cir. 1964) (applying Oklahoma law) (where parties are engaged in enterprises such as oil and gas leases, which fluctuate rapidly and substantially in value, a plaintiff cannot demand specific performance unless it asserts its rights diligently and without unreasonable delay); *Marken v. Goodall*, 478 F.2d 1052, 1054–55 (10th Cir. 1973) (applying Wyoming law and holding laches prevented plaintiff from obtaining specific performance of a preferential right to purchase various oil and gas leases where, after the plaintiff learned of the proposed sale, he "remained silent with regard to his right of refusal while defendants entered upon the costly and risky . . . [venture] which ultimately resulted in greatly enhancing the value of the lease," and it was "only after the [venture] proved successful that plaintiff broke his [two-year] silence and demanded he be permitted to exercise his right of refusal").

Guided by this authority, we agree with the district court that laches bars Kirk's claim for specific performance of the Joint Operating Agreement under Oklahoma law. Here, it is undisputed Kirk was aware in 1991 of the Joint Operating Agreement's

-21-

preferential right to purchase provision and knew the identity of the parties bound by the agreement at that time. As early as 2008, Kirk learned Devon, who was not a party to the Joint Operating Agreement in 1991, was planning to develop the Rother 1-24H well in the Woodford Shale Formation and was actively soliciting parties to invest in the operation. And importantly, in March 2008, Kirk received notice that Chesapeake—who was also not a party to the Joint Operating Agreement in 1991—had elected to participate in the drilling of the Rother 1-24H well. Yet Kirk made no effort to investigate how Chesapeake or Devon obtained their interest or inquire as to any other entities involved. Kirk likewise did not complain about the absence of written notice required by the Joint Operating Agreement or about any lost opportunity to exercise its preferential right to purchase these leaseholds. And Kirk had actual notice in November 2009 that Chesapeake had transferred its interests in Section 24 to Cimarex and that Cimarex was a working interest owner in the Rother 1-24H well. But still, Kirk waited for an additional sixteen months, until the well proved profitable, to seek specific performance and thereby reap the rewards of others' risk, investment, and efforts. Kirk's apparent disinterest in enforcing its rights under the Joint Operating Agreement for approximately three years precludes him from now seeking specific performance of the preferential right to purchase provision. *See Smith*, 50 P.3d at 1141 (holding that a claim was barred by laches where, through silence, the plaintiff acquiesced in the conduct he later sought to challenge).

Kirk asks us to reach a contrary conclusion, asserting that Cimarex failed to show it suffered prejudice because it has not established it invested any money into the Rother 1-24H well or otherwise changed its position after Kirk obtained actual notice of Chesapeake's breach. We are not persuaded. Although Cimarex invested the $1.4 million before Kirk admits it had actual notice of Cimarex's participation in the Rother 1-24H well,[7] this fact does not prevent Cimarex from prevailing on a laches defense. As the district court recognized, actual knowledge of the facts necessary to pursue a right or bring a cause of action is not required; constructive knowledge or the means of knowledge of such facts is sufficient. *See, e.g.*, *id.* at 1140 (holding that a cause of action against defendant accrued when plaintiff had "sufficient information" to realize he had a claim); *Phelan*, 77 P.2d at 11 ("[A]s the rule is sometimes expressed, it is an essential element of laches that the party charged with it should have had knowledge or the means of knowledge of the facts creating his right or cause of action."); *Chesapeake Operating*, 116 P.3d at 217 (a plaintiff may be "charged with knowledge of facts which it ought to have known" (internal quotation marks omitted)). Indeed, "knowledge which is sufficient to lead a prudent person to inquire about the matter, when it could have been ascertained conveniently, constitutes notice of whatever the inquiry would have disclosed, and will be regarded as knowledge of the facts." *Chesapeake Operating*, 116 P.3d at 217 (internal

---

[7] Although Cimarex does not provide the precise dates on which it invested any money in the drilling and completion of the Rother 1-24H well, it is reasonable to infer that the investment occurred sometime between October 2008, when Cimarex obtained Chesapeake's interest, and June 2009, when the well was completed.

quotation marks omitted); *see also Carter Oil Co. v. Crude Oil Co.*, 201 F.2d 547, 551 (10th Cir. 1953) ("Oklahoma has held that under certain conditions one claiming an interest under instruments of record has a duty to improve with diligence the opportunity of learning that which the record discloses and that failing to do so constitutes laches."); *Winn*, 112 F.2d at 622 ("Mere ignorance of the facts will not excuse delay. One must be diligent and make such inquiry and investigation as the circumstances reasonably suggest and means of knowledge are equivalent to actual knowledge.").

Here, Kirk can be reasonably charged with knowledge of Chesapeake's alleged breach of the Joint Operating Agreement prior to Cimarex's investment of $1.4 million. In March 2008, Kirk had notice that Chesapeake, Cimarex's predecessor in interest, along with other entities who were not parties to the Joint Operating Agreement in 1991, was engaged in the construction of the Rother 1-24H well, and was investing significant sums to drill and complete the well. Indeed, Devon informed Kirk that the estimated cost of completion would be over $7 million. Had Kirk been sincerely concerned about past or future breaches of the Joint Operating Agreement, rather than simply waiting to see how the current working interest owners fared on their investment, Kirk could easily have inquired into how they obtained their interests and investigated changes in record title to the leases. Kirk's duty to inquire or take other reasonable efforts to diligently protect its rights was "especially imperative" because the interest Kirk claims—the right to purchase oil and gas leases—involves highly speculative and rapidly changing property. *See Chesapeake Operating*, 116 P.3d at 216.

Through simple inquiry, Kirk could have discovered that Chesapeake obtained an interest in the Leases and contractual rights to operate in the 53.3333 acres Gothic obtained from Amoco in 1997. And the subsequent Chesapeake-Cimarex conveyance was recorded in October 2008. There is no allegation that either Chesapeake or Cimarex concealed anything with respect to the transfer or otherwise. *See Winn*, 112 F.2d at 622. Once Kirk was on notice that participants in the Joint Operating Agreement were in flux and that substantial amounts were being invested to develop the well, it could not sleep on its rights. It was required to make reasonable inquiry, which would have revealed the Chesapeake-Cimarex transaction Kirk now claims constitutes a breach of the Joint Operating Agreement.

Therefore, prior to Cimarex's $1.4 million investment, Kirk was in the position to have had, through reasonable inquiry, knowledge of the facts required to enforce its rights under the Joint Operating Agreement—against Devon, Chesapeake, or Cimarex. Kirk's failure to bring suit until years later, after the Rother I-24H well proved to be profitable, caused Cimarex material prejudice. The district court correctly determined that under Oklahoma law, Cimarex was entitled to summary judgment on the basis of laches.

## III.    CONCLUSION

For the foregoing reasons, we AFFIRM.

ENTERED FOR THE COURT

Carolyn B. McHugh
Circuit Judge

-25-